UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                 )
FIRE INSURANCE EXCHANGE AND       )
FARMERS INSURANCE EXCHANGE.,      )
                                 )
              Plaintiffs,         )
                                 )
                                 )
         v.                       )  CIVIL ACTION NO. 09-11420-PBS
                                 )
ALEXANDER PRING-WILSON AND        )
CINDY GUZMAN, AS EXECUTRIX OF     )
THE ESTATE OF MICHAEL COLONO      )
                                 )
              Defendants.         )
_____)
```

**SARIS, U.S.D.J.**

**MEMORANDUM AND ORDER**
December 21, 2011

**I. Introduction**

In 2003, two young men were involved in a violent and tragic altercation in Cambridge, Massachusetts.  One of the men, eighteen-year-old Michael Colono, died.  The other man, Alexander Pring-Wilson, a Harvard graduate student, became mired in a nearly decade-long, multi-action legal struggle.

Most recently, in March 2006, the Estate of Michael Colono, with Cindy Guzman serving as Executrix, sued Pring-Wilson for wrongful death in state court.  Judge Thomas Billings of the Massachusetts Superior Court found Pring-Wilson liable in negligence and ordered a judgment in the amount of $260,000.

Pring-Wilson's mother, Cynthia Pring, is the named insured on a homeowner's policy issued by Fire Insurance Exchange ("Fire

Insurance") and on an umbrella policy issued by Farmers Insurance Exchange ("Farmers Insurance").  Fire Insurance provided Pring-Wilson with a defense to the claims asserted in the wrongful death proceedings in state court.

On August 26, 2009, the insurers together filed a declaratory judgment action in federal court against Pring-Wilson and Guzman seeking a judicial determination as to whether Cynthia Pring's insurance policies cover the state court judgment against her son.[1]

After a one-day bench trial at which Pring-Wilson and his mother testified, the Court holds that Farmers Insurance is responsible for indemnifying Pring-Wilson according to the provisions of its umbrella policy.

## II. Background Facts

### A. Drunken Combat

The following facts are largely derived from the findings of facts of the state trial judge.

In April 2003, Pring-Wilson was in his second and final year of a Master's degree program at Harvard University.  On the night of Friday, April 12th, while socializing with friends in Cambridge, Pring-Wilson consumed about 7 or 8 alcoholic drinks,

---

[1] Jurisdiction is predicated upon diversity of citizenship under 28 U.S.C. § 1332.  As both parties have agreed, Colorado law governs the interpretation of the Fire Insurance and Farmers Insurance policies.

which considerably impaired him.  Pring-Wilson began walking home alone from a bar as he spoke to his then girlfriend (now wife) on his cell phone.

Meanwhile, Colono, his cousin Sammy Rodriguez, and Rodriguez's girlfriend Giselle Abreu were sitting in a car parked near Pizza Ring, a restaurant at 414 Western Avenue.  Rodriguez and Colono had also been drinking alcohol.

As Pring-Wilson approached the car, Colono, who was sitting in the left-side rear seat of the car with the window open, said something along the lines of, "Look at that motherfucker, he's shitfaced."  Colono told Pring-Wilson to "get off the street." Pring-Wilson ended his call and approached the car, thinking that the occupants might be asking him for directions.  He asked, "Were you talking to me?" Colono replied, "Yeah, do you want to do something about it?"  Pring-Wilson said either "Fuck you" or "Fuck off," and turned to leave.  At that moment, Colono exited the car and attacked Pring-Wilson.

Initially, the two men fought evenly.  But, within seconds, Rodriguez, who worked as a bouncer at a restaurant, joined the fist fight, putting Pring-Wilson at a considerable disadvantage. Rodriguez had been sitting in the front passenger seat of the car.  Because the inside door handle was broken, Abreu, who was sitting in the driver's seat, turned on the car so that Rodriguez could lower his electrically-operated window, reach out, and open

the door from the outside.  This alone caused Rodriguez's delay
in joining the fight.  Rodriguez grabbed Pring-Wilson from behind
and punched him several times in the head while Colono punched
and kicked him from the front.  Neither Colono nor Rodriguez
used, displayed, possessed, or appeared to possess a weapon of
any kind.

At this point, Pring-Wilson reached into his back pocket
where he kept a Sypderco 440v, a large folding knife.  He carried
the knife out of habit as a general utility tool; Pring-Wilson
had no criminal record.  The knife had a plastic handle and a
single, locking, partially serrated four-inch blade with a
finger-sized hole for one-handed operation.  Pring-Wilson opened
the knife and began indiscriminately flailing it in front of him.

Rodriguez, standing behind Pring-Wilson, grabbed him by the
shoulders of his jacket and threw him to the ground.  Colono
said, in Spanish, "Be careful - he has a knife." Rodriguez then
saw the knife for the first time. Colono then said, "Let's go."
He and Rodriguez returned to the car, ending the seventy second
confrontation, and Abreu drove them away.

Pring-Wilson, aware that he had contacted one of his
attackers with the knife, called 911 and reported having seen a
stabbing, but he falsely denied any personal involvement.  Pring-
Wilson had terminated his phone call with his girlfriend at 1:50
a.m. and called 911.

4

At first, none of the occupants in the car realized that Colono had been injured.  In reality, Colono had received five knife wounds, none more than 3/4 of an inch deep.  When Rodriguez realized that Colono was not responding properly, Abreu stopped the car, and Rodriguez pulled Colono out of the car.  Shortly thereafter, Colono died of the stab wound penetrating his heart. The other four knife wounds were not fatal.

**B. Criminal Action**

Pring-Wilson was criminally prosecuted for Colono's death. He was initially convicted of voluntary manslaughter, but that decision was later vacated by the trial judge.[2]  Then, at his second trial, the jury was unable to reach a verdict.  Thus, faced with mounting financial costs, on January 11, 2008, Pring-Wilson pled guilty to the crime of involuntary manslaughter and was given a two year sentence, essentially time served.  In the course of pleading guilty, Pring-Wilson, under oath, admitted to the following: (1) he stabbed Colono with a four-inch knife, (2)

---

[2]The trial judge vacated Pring-Wilson's conviction and ordered a new trial after the Supreme Judicial Court issued Commonwealth v. Adjutant, 824 N.E.2d 1 (Mass. 2005). Adjutant held that, in criminal trials, where a defendant argues that he acted in self-defense, a trial court "has the discretion to admit 'evidence of specific acts of prior violent conduct that the victim is reasonably alleged to have initiated, to support the defendant's claim of self-defense.'" Commonwealth v. Pring-Wilson, 863 N.E.2d 936, 939 (Mass. 2007)(quoting Adjutant, 824 N.E.2d at 13).  In 2007, Pring-Wilson was tried for a second time. At trial, he properly introduced evidence of his attackers' violent criminal histories.

he created a high degree of likelihood that substantial harm
would result to Colono, (3) his wanton and reckless conduct
caused three penetrating wounds to the chest and abdomen of
Colono, and (4) Colono died as a direct and proximate result of
the stabbing.  In the colloquy, he admitted the following
statement by the prosecutor: "The wanton and reckless conduct
engaged in by the defendant, thrusting the knife with a four-inch
blade at Michael Colono was such that the defendant, <u>or a
reasonable person</u>, would have known that it involved a high
degree of likelihood that substantial harm would result to
another." (emphasis added)

### C. Civil Action

In 2006, Cindy Guzman, Executrix of Michael Colono's Estate,
sued for wrongful death in Middlesex Superior Court.

On March 1, 2010, the superior court judge found that Pring-
Wilson negligently caused the death of Michael Colono, and
awarded $260,000.  He also found that Colono was equally at
fault.  The judge reached such a conclusion based on two key
findings.  Pring-Wilson was "negligent: first, in failing to
avail himself of reasonable alternatives to combat, and second,
in employing more force than was reasonably necessary to repel
the attack." <u>Guzman v. Pring-Wilson</u>, Civil Action No. 06-892, at
11 (Middlesex Sup. Ct. Mar. 1, 2010)(Billings, J.).  On the first
point, he notes, "Although Colono started the fight, there is no

evidence that Wilson made any meaningful effort to avoid it, for example, by seeking help from whoever was in Pizza Ring, two car-lengths away."  Id. at 8.  He continues, "On the [second] point, the number of knife wounds inflicted, and particularly the nature of the fatal wound, were disproportionate to the danger actually posed or reasonably apprehended."  Id. at 11.  When Pring-Wilson began "flailing" the knife at Colono, "neither Colono nor Rodriguez used, displayed, possessed, or appeared to possess a weapon of any kind . . . [Wilson] had suffered no injury more serious than minor contusions (bruises) and abrasions (scrapes)."  Id. at 9-10.

However, Billings specifically found that Pring-Wilson did not act out of malice, and did not intend to cause serious harm or death.  Billings wrote, "Wilson's intent in pulling out his knife and using it as he did, was not to kill or even to inflict serious injury on either of his assailants; it was to drive them away.  In so doing, however, he was negligent . . . I recognize that the fight was quick, confused, and (from the outnumbered Wilson's point of view), menacing.  I have found also that he was impaired by alcohol, but this does not relieve him from the duty of reacting reasonably and proportionally to the threat posed."  Id. at 11.

Therefore, placing the burden of proof on Wilson, the Superior Court ultimately concluded that Pring-Wilson was liable

7

in negligence and "lost the privilege of self-defense" because he had not proven by a preponderance of the evidence that "he asserted himself of reasonably available means of avoiding combat, and failed to prove that the force he used was reasonable in the circumstances." Id. at 21.  Pring-Wilson is currently appealing this judgment in the Massachusetts Appeals Court.  His position on appeal is that the trial court erred in finding that he acted negligently because he "intended to use his knife against his assailants."

**D. Fire Insurance Exchange and Farmers Insurance Exchange Policies**

There are two insurance policies at the heart of this case, each providing slightly different coverage.  The first is a primary homeowner's insurance policy issued by Fire Insurance Exchange to Cynthia M. Pring and Eugene Griffith providing coverage from December 20, 2002 to May 1, 2003.[3]  The second is a

---

[3]Under the liability provisions of Fire Insurance Exchange Homeowners Policy, Section II, Coverage E - Personal Liability, the insurer stated:

> We will pay those damages which an insured becomes legally obligated to pay because of bodily injury, property damage or personal injury resulting from an occurrence to which this coverage applies.

The policy defined the term "occurrence" in part to mean

> . . . an accident including exposure to conditions which results during the policy period in bodily injury or property damage.

Farmers Special Personal Umbrella Policy issued to Cynthia M.

Pring providing coverage from May 29, 2002 until May 1, 2003.[4]

The question here is whether either of the policies has a

duty to indemnify Pring-Wilson for the civil judgment levied

against him in the wrongful death suit.  Specifically, this

---

The policy contained an exclusion for intentional acts that
provided:

> We do not cover bodily injury, property damage, or
> personal injury which:
>
> is either (a) caused intentionally by or at the
> direction of an insured; or (b) results from any
> occurrence caused by an intentional act of any insured
> where the results are reasonably foreseeable.

[4]Farmers Insurance issued Personal Umbrella Policy to
Cynthia M. Pring stating:

> If a claim is made anywhere in the world against any
> insured, we will, subject to definitions, exclusions,
> terms and conditions of this insurance, pay damages
> caused by an occurrence in excess of the retained limit
> on the insured's behalf.

The term "occurrence" is defined as:

> with regard to bodily injury or property damage, an
> accident, including continuous or repeated exposure to
> substantially the same harmful conditions, which result
> in bodily injury or property damage during the policy
> period.

An exclusion exists for "bodily injury" that is:

> either expected or intended from the standpoint of an
> insured.

The exclusion does not apply:

> to damages for bodily injury if such insured acted with
> reasonable force to protect persons or property.

decision hinges on whether Cynthia Pring's homeowner's and/or umbrella insurance policies cover (1) Pring-Wilson himself and (2) his specific actions on the night of the altercation.

## III. Collateral Estoppel

To begin, it is necessary to explain what is left for this Court to decide in light of the considerable prior litigation. The factual finding by the Superior Court Judge that Pring-Wilson negligently caused the death of Michael Colono by failing to seek help from the occupants of the nearby Pizza Ring restaurant and employing more force than was reasonably necessary to repel the attack has preclusive effect. See Fire Ins. Exch. v. Pring-Wilson, 778 F. Supp. 2d 116, 126 (D. Mass. 2011). A party is precluded from disputing findings made from a prior adjudication if "(1) there was a final judgment on the merits in the prior adjudication, (2) the party against whom preclusion is asserted was a party (or in privity with a party) to the prior adjudication, and (3) the issue in the prior adjudication was identical to the issue in the current adjudication . . . Additionally, the issue decided in the prior adjudication must have been essential to the earlier judgment." Tuper v. North Adams Ambulance Serv., Inc., 697 N.E.2d 983, 985 (Mass. 1998). As this Court held during summary judgment, all four factors are present here. See Pring-Wilson, 778 F. Supp. 2d at 126. Judge Billings issued a "final judgment on the merits" in the wrongful

death suit brought by the Estate of Colono against Pring-Wilson, who was represented by the insurer.  Many of the facts in dispute here - the reasonableness of his use of a knife and his subjective intent when doing so - are "identical" to those in the state court case.  Billings's findings on these points were "essential" to the conclusion that Pring-Wilson did not act reasonably in self-defense.

The factual findings are "final" even though the judgment has been appealed and is currently under advisement in the Massachusetts Appeals Court.  See Fire Ins. Exch. v. Pring-Wilson, 778 F. Supp. 2d 116, 126 (D. Mass. 2011); O'Brien v. Hanover Ins. Co., 692 N.E.2d 39, 44 (Mass. 1998)("The Federal rule, followed by a majority of the States, is that a trial court judgment is final and has preclusive effect regardless of the fact that it is on appeal."); Bartlett v. Pullen, 586 A.2d 1263, 1266 (Me. 1991)("The general rule is that a judgment is final for purposes of res judicata despite the pendency of an appeal."); see also RESTATEMENT (SECOND) OF JUDGMENTS § 13 cmt. f (1982)(stating that a judgment is not rendered nonfinal simply because a party is appealing).

Pring-Wilson's guilty plea in the criminal case, on the other hand, is admissible in subsequent civil litigation but is not conclusive.  As the Supreme Judicial Court explained in Aetna Cas. & Sur. Co. v. Niziolek, 481 N.E.2d 1356, 1362-63 (Mass.

1985), although a plea may provide evidence in a subsequent civil
trial, "[t]he plea may be explained and the reasons shown for
entering into it."  Pring-Wilson gave credible testimony
regarding the emotional and financial toll of a potential third
criminal trial, motivating his plea.  Accordingly, I find that
Pring-Wilson's plea does not have preclusive effect, but I will
consider it as well as his admissions during the plea colloquy.

**IV. Coverage**

As a threshold matter, the Court must determine whether
Pring-Wilson is covered under his mother's insurance.  Two
general principles of Colorado insurance law play an important
role in the analysis.  The undefined terms of a policy should be
given "their plain, ordinary meaning and interpreted according to
the understanding of the average purchaser of insurance." Compass
Ins. Co. v. City of Littleton, 984 P.2d 606, 617 (Colo. 1999).
However, "[i]f, based on how an ordinary, objectively reasonable
insured would read the whole policy, the question as to existence
of certain coverage is 'susceptible to more than one reasonable
interpretation' . . . then the coverage provisions are ambiguous,
to be construed against the insurer as the drafter of the
policy." Bailey v. Lincoln Gen. Ins. Co., 255 P.3d 1039, 1051
(Colo. 2011).

Under the terms of the primary homeowner's policy issued by
Fire Insurance, the "insured" is defined as either a "permanent

resident" of the policyholder's household under the age of 21 or
a relative of the policyholder.  The umbrella policy issued by
Farmers Insurance provides somewhat different coverage.  The
umbrella policy covers the policyholder and "the following
residents of your household . . . (1) your relatives." "Relative"
is then defined as "persons living with you who are related to
you by blood, marriage, or adoption."  I will take each policy
provision in turn.

     At trial, Fire Insurance contested whether Pring-Wilson, a
graduate student living in Cambridge, Massachusetts, was a
"permanent resident" of his mother's house in Colorado.  Guzman
and Pring-Wilson introduced persuasive evidence of Pring-Wilson's
substantial association with his mother's house - Pring-Wilson
kept a room and numerous possessions in Colorado; he returned
home frequently during the time he was studying at Harvard; he
intended to return home after graduating at the end of May 2003;
he had arranged to end his Cambridge rental the following month;
he informed University of Colorado at Boulder Law School of his
intention to enroll in the fall; he held a valid Colorado
driver's license; he was registered to vote in Colorado; he owned
a truck registered and insured at his Colorado address; and he
paid income tax as a Colorado resident.  Because his mother's
home was about one and a half hours from the University of

Colorado law school, Pring-Wilson planned to live near the
Boulder campus upon matriculating in the fall.  On this basis, I
ruled from the bench that Pring-Wilson was a "permanent resident"
of his mother's home, and therefore eligible for coverage under
the primary policy.

Farmers Insurance now argues that even if Pring-Wilson is
considered a "permanent resident" under the Fire Insurance
primary policy, he is not covered by its umbrella policy, which
extends coverage only to those "living with [the policyholder]."
According to Farmers, "living with you" refers to a relative who
has a significant physical presence in the policyholder's home on
the date of the accident. Farmers Insurance raised this issue for
the first time after trial.  It neglected to address it in
closing arguments.

Few Colorado cases have interpreted the term "living with"
in the context of an insurance policy.  Two Colorado courts
interpreting the words have held the term is ambiguous.  Compare
Am. Standard Ins. Co. v. Savaiano, 298 F. Supp. 2d 1092, 1096 n.1
(D. Colo. 2003)(recognizing that because the language, "living
with" is ambiguous, a minor child of divorced parents was covered
as a dual resident under both the custodial and noncustodial
parent's insurance); with Potter v. State Farm Mut. Auto. Ins.
Co., 996 P.2d 781, 784 (Colo. App. 2000)(holding that the
policyholder's "nomadic" adult son (not in school) did not "live

14

with" her when his presence in the house was merely transient because he did not intend to stay with her for the foreseeable future).

Farmers' intertwined use of both the term "resident" and the phrase "living with" obfuscates the meaning of both.  Because Farmers Insurance did not specify that being a "resident" of a household was not sufficient to trigger coverage if the student was not also "living with" the family, this Court applies a broad interpretation of this ambiguous phrase.  See, e.g., McDonough v. State Farm Mut. Auto. Ins. Co., 755 S.W.2d 57, 65 (Tenn. Ct. App. 1988)("The words 'live' and 'reside' are synonymous.").

Pring-Wilson was not physically living with his mother on the date of the accident because he was away at school, but he was living with her in the sense that his school addresses were all temporary and he was a resident of the home.  He was not yet formally engaged and planned to move home within weeks.[5]

Farmers cites to several cases outside the Colorado court system that favor a literal interpretation of the phrase "living with" and deny coverage.  However, these cases do not address the

---

[5]Other state courts have also found the phrase "living with" to be inherently ambiguous.  See Davis v. State Farm Mut. Auto. Ins. Co., 583 So.2d 225, 230 (Ala. 1991)(finding the term to be ambiguous because it potentially referred to either "a very temporary [or] permanent abode."); Fisher v. Novak, No. 88C-MY-21, 1990 WL 82159, at *3 (Del. Super. Ct. June 11, 1990) ("[T]he phrase to 'live with' is ambiguous.  It can mean . . . 'to reside with, to dwell permanently and continuously with.' It can also mean 'to occupy a home with, to dwell with.'").

unique situation of an adult child away at school but planning to return home.  See, e.g., Stoner v. State Farm Mut. Auto. Ins. Co., 780 F.2d 1414, 1415, 1417 (8th Cir. 1986)(finding that the language "lives with" means "actually living in fact"; thus, the court held that a twenty-one year old woman, who had enlisted in the Navy for a four-year term, was not covered by her father's automobile insurance because she was stationed in Dallas, even if South Dakota remained her legal residence); Ridell v. State Farm Mut. Auto. Ins. Co., No. 97-3386, 1999 WL 410325, at *2-3 (Wis. Ct. App. June 22, 1999)(non-student, working adult).

This scenario of a student living outside the home to go to college or graduate school is hardly unusual.  According to the National Center for Education Statistics, 69 percent of undergraduate students between 2003 and 2004, around the same time of the incident in this case, lived on or near campus while attending school, instead of living with parents or relatives. See 2010 Digest of Education Statistics, Table 240, National Center for Education Statistics, http://nces.ed.gov/programs/digest/d10/tables/dt10_240.asp (last visited Dec. 20, 2011).  This number did not significantly change when the National Center for Education Statistics measured it again four years later. Id.  Farmers Insurance's literal interpretation of the term "living with" - providing coverage only for children who were students if they were physically

16

living at the home at the time of the accident - would exclude
most students from coverage under their parents' insurance
policies.  Imagine their surprise.  In light of the contemporary
realities of family living, in which most students remain
residents of their parents' houses long after the age of
majority, it is incumbent upon insurance companies to state
clearly that students are not covered if they are not physically
living with their parents on the date of the accident so that the
average purchaser of insurance understands this limitation in
coverage.  Cf. Moller v. State Farm Mut. Auto. Ins. Co., 566
N.W.2d 382, 387 (Neb. 1997)(finding in favor of a broad
definition of "living with" because of "the contemporary
realities of family living"; thus, "lives with" encompasses "an
unemancipated child's relationship with both parents where that
child reasonably feels that he or she 'belongs' at either home").

Because Cynthia Pring's home would have continued to be
Pring-Wilson's permanent residence for the foreseeable future, he
was indeed "living" there even while he was living at temporary
addresses while at school. Therefore, Cynthia Pring's primary
policy and umbrella policy extend coverage to her son, Pring-
Wilson.

Farmers insists that Pring-Wilson is not covered by the
umbrella policy because the policy only covers "damages caused by
an occurrence in excess of the retained limit on the insured's

17

behalf." "Retained limit" is defined, for the purposes of this case, as "the total limits of liability of any underlying insurance providing coverage for damages as the result of an occurrence." As a result, Farmers argues that Pring-Wilson cannot benefit from the coverage of the umbrella policy because the underlying policy has a liability limit of $500,000 per occurrence and the damages in this case do not exceed that amount. This is another issue that was barely briefed, if at all.

Generally speaking, umbrella policies fill both (1) vertical gaps in coverage, where the amount sought to be recovered exceeds the liability limit of the primary policy, and (2) horizontal gaps in coverage, where the primary policy provides no coverage at all. See Dolly v. Old Republic Ins. Co., 200 F. Supp. 2d 823, 840 (N.D. Ohio 2002). See generally Lee R. Russ, Couch on Insurance § 220:32 (3rd ed. 2011)("[U]mbrella policies often provide primary coverage for risks that the underlying policy does not cover."). "Horizontal coverage is said to 'drop down' to provide primary coverage for situations where the underlying insurance provides no coverage at all." Dolly, 200 F. Supp. 2d at 840.

The umbrella policy here includes such a "drop-down" provision. It explains that "[i]f underlying insurance does not cover damages covered by this policy, we will pay damages which

18

exceed the retained limit in Item 4 of the Declarations."  The
retained limit in Item 4 of the umbrella policy is $250.  The
umbrella policy, therefore, covers Pring-Wilson to the extent
that he is not covered by the underlying policy.

## V. Coverage for Accidents

Under the terms of both the primary homeowner's policy and
the umbrella policy, the insurance company is obligated to pay
damages resulting from an "occurrence."  With regard to bodily or
property damage, "occurrence" is defined as an "accident."
Accident is not a defined term in either policy.

Both policies include exclusions to this coverage.  The
primary policy, Fire Insurance, carves out an exception for
damages either "caused intentionally by or at the direction of an
insured; or result[ed] from any occurrence caused by an
intentional act of any insured where the results are reasonably
foreseeable."  The umbrella policy, Farmers Insurance, provides
that coverage shall not extend to damages that are "[e]ither
expected or intended from the standpoint of the insured."

The insured, Pring-Wilson, bears the burden of demonstrating
that the incident is an "occurrence" that falls within the
policies' personal liability coverage. See Colo.
Intergovernmental Risk Sharing Agency v. Northfield Ins. Co., 207
P.3d 839, 842. (Colo. App. 2008).   The insurers then bear the
burden of demonstrating that an exclusion applies.  Id.

19

### 1. The "Occurrence" Provision

In deciphering the meaning of the word "accident," which defines "occurrence" under both policies, Colorado courts construe it in favor of the insured. <u>See</u> <u>State Farm Mut. Auto. Ins. Co. v. McMillan</u>, 925 P.2d 785, 793 (Colo. 1996).  In so doing, the Court considers the "common and ordinary understanding of the word 'accident' as a reasonable insured would understand the term." <u>LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment and Dependent Life Ins. Plan</u>, 605 F.3d 789, 806 (10th Cir. 2010)(holding in an ERISA case that insured died in an "accident" when his car rolled over on a country road even though he was traveling in excess of the speed limit and had a blood alcohol level almost three times the legal limit).  In fact, the Colorado Supreme Court has held that "the determination of whether an 'accident' has occurred should be viewed from the standpoint of the insured." <u>McMillan</u>, 925 F.2d at 793-94.  The Court specifically rejected the "objective viewpoint" urged by the insurance company.  <u>Id.</u>

Many courts have struggled to define the term accident, a surprisingly elusive term.  Generally speaking, one definition of the term "accident" is "an unanticipated or unusual result flowing from a commonplace cause." <u>Fire Ins. Exch. v. Bentley</u>, 953 F.2d 1297, 1301 (Colo. App. 1998).  As the insurers point out, a stabbing is not a "commonplace cause."  Still, sometimes

20

accidents can occur as a result of uncommon causes.  For example,
Random House Unabridged Dictionary defines "accident" as simply,
"an undesirable or unfortunate happening that occurs
unintentionally and usually results in harm, injury, damage, or
loss; casualty; mishap," without any reference to the commonness
of the cause.  <u>Random House Unabridged Dictionary</u> 12 (2d ed.
1993).

Adopting a broad interpretation of the term "accident," the
Colorado Supreme Court formulated another definition, holding
that "a voluntary act that causes an unforeseeable, unintended,
or unexpected result can be considered an accident." <u>See</u> <u>Carroll</u>
<u>v. CUNA Mut. Ins. Soc.</u>, 894 P.2d 746, 753 (Colo. 1995);[6] <u>see</u> <u>also</u>
<u>Am. Family Mut. Ins. Co. v. Terlingen</u>, No. 08-cv-01273-REB-MJW,
2008 WL 5156425, at *2 (D. Colo. Dec. 9, 2008)(denying coverage
where "it [was] completely within the realm of foreseeable
consequence that [the victims] should have sustained injuries of
the type and degree alleged as a result of being struck
repeatedly with a golf club.")

---

[6]In <u>Carroll</u>, the plaintiff's wife, who had hypertension,
died from a ruptured aneurysm during sex. The court concluded
that it was an accident under the policy because (luckily) death
is not an anticipated, intended, or foreseeable result of sexual
intercourse.

It is unclear under Colorado law if the term "accident" includes negligent use of force in self-defense[7] which results in subjectively unintended but reasonably foreseeable harm.  And, again, "accident" is an undefined term in both policies.  If the word is broadly construed in favor of the insured, and from the vantage point of the insured, Colono's death was "accidental" in the ordinary sense of that word.[8]

---

[7] While there are no Colorado cases on point, courts in other jurisdictions have found that injury or death resulting from privileged acts taken in self-defense can constitute an "accident."  See, e.g., Vermont Mut. Ins. Co. v. Walukiewicz, 966 A.2d 672, 678 (Conn. 2009)(laying out the split in the courts concerning whether bodily injuries inflicted in the course of self-defense are an "accident" and concluding that actions taken in self-defense are "unplanned and unintentional" and, therefore, accidental); Breland v. Schilling, 550 So.2d 609, 614 (La. 1989)("[W]hen minor injury is intended, and a substantially greater or more severe injury results, whether by chance, coincidence, accident, or whatever, coverage for the more severe injury is not barred.").  This line of cases does not apply here because the state court judge found that Pring-Wilson's acts were not privileged acts of self-defense.

[8] Notably, at trial Plaintiffs did not press the argument that this incident was not an "accident" within the meaning of the policy; they skim over the issue in their findings of fact. And, again, the Plaintiffs failed to include this debate in their closing arguments except to somewhat concede the issue upon the Court's acceptance of Judge Billings's findings:

> Mr. Schneider: . . . giving [the defendants] the benefit of the doubt that they satisfied the policy definition of an occurrence . . .
>
> The Court: And if I accept Judge Billings' findings that it was negligent use of force, what does that do for you?
>
> Mr. Schneider: . . . At best, it gets them over the occurrence hurdle.

### 2. "Reasonably Foreseeable" Exclusion Under the Primary Policy

Under the primary policy's reasonably foreseeable results exclusion,[9] Pring-Wilson would not be covered if Fire established that bodily injury resulted from an "occurrence caused by an intentional act of any insured where the results are reasonably foreseeable."

While the state court judge did not dwell on the causation point, the state court's determination that Pring-Wilson negligently caused Colono's death is binding here.  Under Massachusetts law, "[T]he risks that ma[ke] an actor negligent are limited to *foreseeable* ones, and the factfinder must determine whether the type of harm that occurred is among those reasonably foreseeable potential harms that made the actor's conduct negligent." Leavitt v. Brockton Hosp., Inc., 907 N.E.2d 213, 220 n.20 (Mass. 2009)(emphasis added); Guzman v. Pring-Wilson, Civil Action No. 06-892, at 21 (Middlesex Sup. Ct. Mar. 1, 2010)(Billings, J.).  Because of this negligence finding of

_____

However, Fire Insurance vigorously protests that the exclusion applies.

[9]Because Judge Billings found that Pring-Wilson did not subjectively intend to kill or inflict serious injury on either of his assailants, the primary policy's intentional act exclusion does not apply.  The exclusion read: "We do not cover bodily injury, property damage, or personal injury which . . . is . . . caused intentionally by or at the direction of an insured."

the state court, Fire argues it has established that the
resulting harm would have been reasonably foreseeable.

     However, the analysis is not so straight-forward.  The
"reasonable foreseeability" analysis is different under Colorado
insurance law than it is under Massachusetts negligence law.
"Insurance contracts are designed to protect [insureds] from
damages for which under traditional principles of tort law the
insured might be liable." See American Family Mut. Ins. Co. v.
Johnson, 816 P.2d 952, 956 (Colo. 1991).  All liability insurance
policies have an exclusion for "intentional damages" caused by or
at the direction of the insured to "prevent extending to the
insured a license to commit harmful, wanton or malicious acts."
Johnson, 816 P.2d at 957.  "However, the payment of premiums for
liability insurance policies becomes pointless if all damages
that result from an intentional act are excluded from coverage.
Most individuals can protect themselves from causing intentional
harm.  It is the unexpected result that is cause for concern and
the reason for seeking protection through liability insurance."
Id. at 955; see also LaAsmar v. Phelps Dodge Corp. Life,
Accidental Death & Dismemberment & Dependent Life Ins. Plan, 605
F.3d 789, 810-11 (10th Cir. 2010)("[T]he fact that injuries and
death are 'foreseeable' in a general manner is the very reason
that people purchase insurance against accidents - no one who
found a plane crash 'unforeseeable' would purchase trip

24

insurance.").

The insurer has met its burden of proving that the exclusion applies.  An objectively reasonable person in the position of the insured - flailing a four-inch knife at an assailant - reasonably would have foreseen some injury, even if serious injury and death is not what he subjectively intended or expected. Cf. Fire Ins. Exch. v. Bentley, 953 P.2d 1297, 1301 (Colo. App. 1998)(concluding that, where an insured had a sexual-encounter that he taped without his partner's consent and then he played the tape recording for third parties, the resulting harm was "not necessarily unanticipated or unusual," rather it was "reasonably foreseeable" as a matter of law).  Moreover, Pring-Wilson admitted reasonable foreseeability in the plea colloquy, and while his plea is not preclusive, the court gives weight to the admissions.

As a result, the "reasonably foreseeable" exclusion in the primary policy issued by Fire Insurance Exchange precludes coverage for the judgment levied against Pring-Wilson in its entirety.

**3. "Expected or Intended" Exclusion Under the Umbrella Policy**

The terms of the umbrella policy provide a different exclusion from coverage for an accident.  The Farmers Insurance policy states that coverage shall not extend to damages that are "[e]ither expected or intended from the standpoint of the

25

insured." Critically, this exclusion makes an exception for self-defense "if such insured acted with reasonable force to protect persons or property"; in such cases, the insured is covered. If Farmers can establish that the exclusion for "expected or intended" damages applies, then the burden shifts back to the insured to demonstrate that the self-defense exception brings Pring-Wilson's actions back within the ambit of the personal liability policy. See Leprino Foods Co. v. Factory Mut. Ins. Co., 453 F.3d 1281, 1287 (10th Cir. 2006)(stating that the burden shifts back to the insured to prove applicability of an exception to an exclusion).

The Colorado courts have determined that the subjective standard of interpretation attaches to the phrase "expected or intended." See e.g., Johnson, 816 P.2d at 955 (holding that an insured's actions in kicking a woman, whom he thought was his estranged wife leaving the bar with a group of men, fell within an exclusion for acts "intended or expected" by the insured); Hoang v. Monterra Homes (Powderhorn) LLC, 129 P.3d 1028, 1034 (Colo. App. 2005)(applying a subjective standard where the builder's knowledge, actions, and intentions indicated he did not expect or intend property damage to occur); see also Vermont Mut. Ins. Co. v. Walukiewicz, 966 A.2d 672, 678 (Conn. 2009). Furthermore, a subjective standard is particularly appropriate in the instant case because "expected or intended" is modified by the phrase "from the standpoint of the insured" in the language

26

of the policy.

Under the subjective standard, coverage is excluded only if the insured actually expected or intended the consequent damage or injury. See Hecla Min. Co. v. N.H. Ins. Co., 811 P.2d 1083, 1088 (Colo. 1991)("[W]hat make injuries or damages expected or intended rather than accidental are the knowledge and intent of the insured."). "Intended or expected" means that the insured desired to cause the consequences of his act - serious bodily injury or death - or "knew that they would flow directly and immediately from the insured's intentional act"; the damage must be practically certain. Id. at 1088. "Expected" does not mean the damage was foreseen as possible; such analysis is reserved for the "reasonably foreseeable" language above. See id. The phrase "expected or intended" operates almost identically to an intentional act exclusion predicated solely on intent, such as the one in Fire's primary policy. See id. at 1087; Poole v. State Farm Fire & Cas. Co., 941 F. Supp. 964, 969 (D. Colo. 1996)("[A] person who performs an act that is virtually certain to cause injury intend[s] to cause such injury."). However, the exclusion is inapplicable "if and only if the insured acts without any intent or any expectation of causing any injury, however slight. And, conversely, such exclusion is applicable if the insured acts with the intent or expectation that bodily injury will result even though the bodily injury that does result is different either in character or magnitude from the injury

27

that was intended."  <u>Butler v. Behaeghe</u>, 548 P.2d 934, 938 (Colo. 1976)  When "injury is intended it's immaterial that the particular injury that resulted was not specifically intended." <u>Id.</u> at 939.  Thus, again, the Court undertakes a highly fact-based analysis.

Farmers has not established that Pring-Wilson subjectively expected or intended *any* harm to Colono.  The wounds were shallow and consistent with Pring-Wilson's description and demonstration in court that he was waving the knife back and forth to ward off his assailants.  Indeed, even Colono did not immediately know he was stabbed.  It was not "practically certain" serious harm would result from Pring-Wilson's actions.  <u>See Armstrong Cleaners, Inc. v. Erie Ins. Exch.</u>, 364 F. Supp. 2d 797, 810 (S.D. Ind. 2005)(holding that, under Indiana law, negligent or reckless conduct is not enough to meet the "practically certain" standard for an "expected" injury).  Therefore, based on the record of the trial, I find that the plaintiff has not proved that injury to Colono was "expected or intended" from Pring-Wilson's perspective.  As a result, Farmers umbrella policy provides coverage for Pring-Wilson's judgment.[10]

---

[10]The umbrella policy's exclusion clause includes an exception for self-defense, stating that the exclusion "does not apply to damages for bodily injury if such insured acted with reasonable force to protect persons or property."  In such cases, Farmers Insurance would cover the damages.  However, the Court does not reach the question as to whether this exception applies because the Court is bound by the Superior Court's finding that Pring-Wilson did not act reasonably in self-defense.

For these reasons, I find that the primary homeowners policy issued by Fire Insurance Exchange does not cover the Superior Court judgment against Pring-Wilson for the wrongful death of Michael Colono.  However, Farmers Insurance has a duty to indemnify Pring-Wilson according to the terms of its umbrella policy.

**ORDER**

The Court orders entry of judgment in favor of defendants against Farmers Insurance, and in favor of Fire Insurance against defendants.


/s/ PATTI B. SARIS
PATTI B. SARIS
United States District Court